UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:

Angela Thompson,                        Case No. 15-49347
                                             Chapter 7
     Debtor.                               Hon. Mark A. Randon
_____/

Edward Szachta and Mary Van Hevele,

     Plaintiffs,

                                                Adversary Proceeding
                                                Case No. 15-04775
v.

Angela Thompson,

     Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

Brian J. Benner was disbarred from the practice of law after orchestrating a scheme through which he misappropriated client settlement proceeds.[1]  Angela Thompson worked for Benner's now-defunct personal injury law firm ("the firm"), serving, at various times, as its office manager, bookkeeper, and legal secretary or assistant.  Facing lawsuits from defrauded clients like Edward Szachta and Mary Van Hevele ("Plaintiffs"),

---

[1]To date, Benner owes his clients in excess of $1,300,000.00 in unpaid settlement proceeds.

1

Benner, the firm, and Thompson separately filed bankruptcy. Plaintiffs allege that Thompson conspired with Benner to defraud them, and is jointly liable for the debt. Thompson says she was an unwitting participant who simply processed wire transfers–at Benner's direction–and is not liable for *his* wrongdoing.

Plaintiffs filed an adversary proceeding challenging the dischargeability of the debt under 11 U.S.C §§523(a)(2)(A), 523(a)(4), and 523(a)(6). Thompson's motion for summary judgment is pending. Because the record contains evidence that Thompson and Benner were co-conspirators, the Court **DENIES** summary judgment under sections 523(a)(2)(A) and 523(a)(6); however, the Court **GRANTS** summary judgment under section 523(a)(4) as Thompson neither acted in a fiduciary capacity nor embezzled Plaintiffs' money.

## II.  FACTS

### A.  *Thompson and Benner's Responsibility for Client Settlement Proceeds*

Benner was a named partner of the firm; Thompson worked there for nearly 30 years. Both were signatories on the firm's bank accounts–including one earmarked for client funds ("the IOLTA account").[2] Benner authorized Thompson to make wire transfers between the firm's accounts, and she routinely transferred money from the IOLTA account to the general account, from which she paid the firm's expenses. As a

---

[2]IOLTA is an acronym for Interest on Lawyer Trust Accounts. In Michigan, client funds cannot be commingled with the lawyer's funds. *See* Michigan Rule of Professional Conduct 1.15(d).

result, the IOLTA account balance was often insufficient to pay the firm's clients their settlement proceeds.

### B. *Plaintiffs Retain the Firm to Represent them in a Lawsuit*

Plaintiffs, Szachta and Van Hevele, are a married couple. On May 13, 2013, Szachta was seriously injured in a motor vehicle accident caused by a SMART bus.[3] Plaintiffs retained the firm to sue SMART and its bus driver. The case settled for $1,000,000.00. After deducting the firm's fees and expenses, Plaintiffs were to receive $660,243.48.

### C. *Plaintiffs Sign the Settlement Documents and Limited Power of Attorney*

On May 12, 2014, Plaintiffs met with Benner and another attorney to sign the settlement documents. At Benner's request, Plaintiffs also signed a limited power of attorney, which Benner explained was required to deposit Plaintiffs' settlement checks into the IOLTA account. Benner told them not to worry if their checks were delayed, because it would take several months for SMART to process them and up to six months to obtain a Medicare clearance.[4] It is unclear whether Thompson was present at this meeting. However, she did witness and notarize Plaintiffs' signatures, attesting that they personally appeared before her on May 12, 2014 and voluntarily signed the settlement

---

[3]SMART is an acronym for Suburban Mobility Authority for Regional Transportation.

[4]Curiously, Szachta never requested coverage from Medicare or Medicaid for his medical treatment.

documents. No one at the meeting informed Plaintiffs that: (1) Benner was under investigation by the Michigan Attorney Grievance Commission for misappropriating settlement proceeds; (2) several clients had complained to the firm about not receiving their settlement proceeds; or (3) the firm would use Plaintiffs' settlement proceeds for its own purposes.

### D. *Thompson Receives the Settlement Checks and Disburses the Proceeds*

Seven days later, on May 19, 2014, Thompson received the settlement checks from SMART, payable to the firm and Plaintiffs. Benner presumably endorsed the checks on Plaintiffs' behalf (as authorized by his limited power of attorney), and they were deposited into the IOLTA account.[5] No one at the firm informed Plaintiffs that their settlement checks had arrived.[6] And no one sent Plaintiffs their money.[7] Instead–at Benner's direction–Thompson transferred Plaintiffs' settlement proceeds from the IOLTA account to the general account, from which she then paid the firm's operating expenses, as well as her own car payment, car insurance, and health insurance premiums.

---

[5]The Michigan Rules of Professional Conduct provide: "[a] lawyer shall hold property of clients . . . in connection with a representation separate from the lawyer's own property. All client . . . funds shall be deposited in an IOLTA or non-IOLTA account." MRPC 1.15(d).

[6]The Michigan Rules of Professional Conduct provide: "[a] lawyer shall[] promptly notify the client . . . when funds . . . in which a client . . . has an interest is received[.]" MRPC 1.15(b)(1).

[7]The Michigan Rules of Professional Conduct provide: "[a] lawyer shall[] promptly pay or deliver any funds . . . that the client . . . is entitled to receive[.]" MRPC 1.15(b)(3).

Thompson testified that she and Benner would routinely meet to discuss the firm's expenses; Benner would tell her how much money to transfer from the IOLTA account to the general account. Thompson says, "[t]hat's the way he [Benner] always did it."

### E. *Szachta Inquires about his Settlement Proceeds*

In July 2014, Szachta began calling the firm about his money. Knowing that the firm had already received the checks and spent most of the money on the firm's operating expenses and her personal bills, Thompson feigned ignorance: she told Szachta she "would try to find out what was going on." Thompson explained that this was *Benner's* "standard practice": he instructed her to tell clients who called about their money that it would take a few more weeks or months for the checks to arrive. This stall tactic gave Benner time to settle other cases and potentially pay Plaintiffs from the proceeds of other clients' settlements.

### F. *Plaintiffs Receive a Partial Payment of their Settlement Proceeds*

On October 16, 2014–after repeated inquiries from Szachta–Thompson says she and Benner met, and he decided the firm could make a partial payment. After the meeting, the firm sent Plaintiffs a $250,000.00 check. To date, however, the $410,243.48 balance remains unpaid.

### G. *State Court Litigation and Bankruptcy Filings*

Plaintiffs sued the firm, Benner, and Thompson in the Macomb County Circuit Court alleging conversion, fraud, negligence, and breach of fiduciary duty. The day Thompson was served, she stopped working at the firm "[b]ecause [she] couldn't handle

5

15-04775-mar    Doc 44    Filed 03/15/16    Entered 03/15/16 15:27:26    Page 5 of 16

the stress. [She] felt bad for the clients not getting their monies. It was finally becoming obvious to [her] what was going on. [Her] eyes should have been open a long time ago, but they weren't."

While the state-court litigation was pending, Benner, the firm, and Thompson separately filed bankruptcy. This adversary proceeding followed. Plaintiffs allege that Thompson is liable for the debt owed to them, and that it is nondischargeable because she and Benner conspired to misappropriate their settlement proceeds. Thompson blames Benner. She considers herself an unwitting participant and a victim–Benner owes her $21,000.00 in unpaid loans she made to the firm from her 401(k) and for charges she made to her personal credit card to keep the firm afloat. Thompson moves for summary judgment that the debt *is* dischargeable on, essentially, two related grounds: (1) she was simply a "non-attorney employee legal assistant," who could only act at Benner's direction; and (2) she cannot be held responsible for Benner's false pretenses or fraudulent conduct.

### III. STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, summary judgment must be granted "if the movant shows that there are no genuine issues as to any material fact in dispute and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *CareToLive v. Food & Drug Admin.*, 631 F.3d 336, 340 (6th Cir. 2011). The standard for determining whether summary judgment is appropriate is whether "the evidence presents

6

a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Pittman v. Cuyahoga County Dep't of Children Services*, 640 F.3d 716, 723 (6th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

The Court must draw all reasonable inferences in favor of the party opposing the motion. *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676 (6th Cir. 2011). However, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). A mere scintilla of evidence is insufficient; there must be evidence on which a jury could reasonably find for the non-movant. *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011).

## IV. LEGAL ANALYSIS

Thompson's defense to this nondischargeability action is that *Benner's* conduct and statements caused Plaintiffs' loss. But Plaintiffs allege Thompson was complicit in the scheme, which worked as follows:

(1) Benner obtained a limited power of attorney so clients' settlement checks could be deposited into the IOLTA account without notifying them that the checks had been received;

(2) Benner told clients their checks would not arrive for several months;

(3) upon receipt of the settlement checks, they were deposited into the IOLTA account without informing the clients;

(4) Thompson and Benner routinely met to determine the amount of the firm's expenses;

7

(5) Thompson transferred money needed to pay the firm's expenses (as well as her car payment, car insurance, and health insurance) from the IOLTA account to the general account; and

(6) when clients inquired about the status of their settlement checks, Thompson told them it would take additional weeks or months for the checks to arrive–even though she knew the firm had already received and spent the money.

Significantly, after the two checks totaling $1,000,000.00 from Plaintiffs' settlement were deposited into the IOLTA account, the balance was $1,308,205.57. However, within a month, Thompson had transferred all but $147,489.23 out of the IOLTA account. She admits that none of that money was paid to Plaintiffs. Thompson knew that several clients had complained about not receiving their settlement proceeds while others had received only partial payments. She even drafted an "Outstanding Client Monies" chart that shows $1,495,000.00 was owed to clients, but the balance in the IOLTA account was only $120,000.00.[8] Thompson was also aware that the Attorney Grievance Commission was investigating Benner.[9] Finally, she had personal knowledge of the firm's financial problems. She testified that Benner "had more money going out than he had coming in." The firm often made payroll "[b]y the skin of [its] teeth," and Thompson had to use her personal credit cards to pay the firm's expenses; she also

---

[8]Plaintiffs were included on the chart; it showed they were owed $410,000.00.

[9]On March 7, 2014, the Michigan Attorney Grievance Commission requested that Benner be disciplined by the Michigan Attorney Discipline Board for misappropriating client funds. Benner was disbarred in Michigan effective September 1, 2014.

8

15-04775-mar    Doc 44    Filed 03/15/16    Entered 03/15/16 15:27:26    Page 8 of 16

borrowed from her 401(k) to loan the firm money.[10]

### A. 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) provides that a debtor is not discharged from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by[] false pretenses, a false representation, or actual fraud[.]" Plaintiffs allege the debt owed to them is nondischargeable based on false pretenses and actual fraud.

False pretenses are "implied misrepresentations intended to create and foster a false impression." It includes conduct and material omissions. *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 222 (B.A.P. 10th Cir. 2013). A debt that arises from a fraudulent scheme may be nondischargeable–against all co-conspirators–based on the totality of the circumstances:

> Implied misrepresentations that are intended to create and foster a false impression by co-conspirators in furtherance of a fraudulent scheme may be attributed to a debtor who is an active, willing and knowing participant in the fraudulent scheme for purposes of Section 523(a)(2)(A). Fraudulent intent for purposes of Section 523(a)(2)(A) can be shown by establishing that the debtor was a willing participant in a fraudulent scheme and thereby intended to deceive a creditor.

*Id.* at 223-224 (internal citation omitted).

Similarly, actual fraud under section 523(a)(2)(A) "encompasses any deceit,

---

[10]Checks, drawn on the general account, were also made out to Thompson for various amounts totaling nearly $40,000.00 after the firm received Plaintiffs' settlement checks. For example, in May 2014, Thompson received a check for $5,611.08; the next month she received a check for $3,518.20; but in October 2014, she received a check for $7,345.05. Thompson says these were salary checks, but she could not explain why the amounts varied so greatly.

9

artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (B.A.P. 6th Cir. 2001) (internal quotations and citation omitted). "When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code." *Id*.

As outlined above, there is support in the record that Benner masterminded the scheme to misappropriate client settlement proceeds and that Thompson was an active, willing, and knowing participant. Thompson's argument that she did not make a false statement to Plaintiffs before the firm received the settlement checks is of no moment: Benner's misrepresentations and material omissions may be attributed to Thompson if she was a co-conspirator. *In re Sturgeon*, 496 B.R. at 229 ("misrepresentations and material omissions [of a co-conspirator] can be attributed to the Debtor because he was an active, willing, and knowing participant in the fraudulent scheme"). A genuine issue of material fact exists as to whether Thompson was a co-conspirator in Benner's fraudulent scheme precluding summary judgment under 11 U.S.C. § 523(a)(2)(A).

### B. *11 U.S.C. § 523(a)(4)*

Section 523(a)(4) provides that a debt is nondischargeable "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" Plaintiffs allege the debt owed to them is nondischargeable based on Thompson's defalcation, or her embezzlement of their money.

10

### 1. Thompson was not a Trustee of the IOLTA Account

A debt is nondischargeable as "defalcation" when the preponderance of the evidence establishes: (1) a preexisting fiduciary relationship; (2) breach of that fiduciary relationship; and (3) a resulting loss. *Bd. of Trustees of the Ohio Carpenters' Pension Fund v. Bucci (In re Bucci)*, 493 F.3d 635, 639 (6th Cir. 2007). "Fiduciary capacity"–for section 523(a)(4) purposes–is narrowly defined: "[i]t does not apply to someone who merely fails to meet an obligation under a common law fiduciary relationship. [T]he defalcation provision applies to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *Id.* To establish an express or technical trust, Plaintiffs must prove: (1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary. *Id.* at 640 (quotations and citation omitted).

Plaintiffs' settlement proceeds were required to be deposited in the IOLTA account, separate from money that belonged to the firm. This evidences an intent to create a trust. The settlement proceeds were the trust res, Plaintiffs were the beneficiaries, and Benner was a trustee. A trust was established. But was Thompson also a trustee?

"The question of who is a fiduciary for purposes of section [523(a)(4)] is one of federal law, although state law is important in determining when a trust relationship exists." *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249, 251 (6th Cir. 1982). In Michigan, the Rules of Professional Conduct place *lawyers* under a fiduciary

11

duty to safeguard client funds. *See generally* Michigan Rule of Professional Conduct 1.15 and its Comment ("*[a] lawyer* should hold property of others with the care required of a professional fiduciary") (emphasis added); *see also Matter of Baun*, 396 Mich. 421, 422-423 (1976) ("[t]he conduct of the Respondent and the evidence show a willful disregard of his obligations as a fiduciary and trustee. [T]here are few business relations involving a higher trust and confidence than that of an attorney acting as trustee in the handling of money for his client[.]").[11]

Benner was Plaintiffs' lawyer; he–not Thompson–had a fiduciary duty with regard to Plaintiffs' settlement funds. Thompson was not a trustee of the IOLTA account and, therefore, had no pre-existing fiduciary relationship with Plaintiffs. *See R.E. Am., Inc. v. Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir. 1997) (finding that the attorney-client relationship, alone, was not enough to establish a fiduciary relationship: "the debtor must hold funds in trust for a third party to satisfy the fiduciary relationship element of the

---

[11]Michigan Rule of Professional Conduct 5.3 discusses the responsibilities regarding nonlawyer assistants, like Thompson:

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the rules of professional conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with knowledge of the relevant facts and the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner in the law firm in which the person is employed or has direct supervisory authority over the person and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

defalcation provision of § 523(a)(4)"); *Gianoukas v. Campitiello*, Case No. 09-1266, 2009 WL 3270808, at *3 (S.D.N.Y. Oct. 13, 2009) (no fiduciary duty exists by simply placing funds in an account, or by being a signatory on that account); *see also* Michigan Ethics Opinion April 27, 1990, R-007:

> The [IOLTA] account should be established in the name of the lawyer or law firm. In a solo practice, the lawyer may be the only account signatory. In a firm with more than one principal, accounting controls should be in place to handle trust account deposits and withdrawals in keeping with the *lawyers'* fiduciary, ethical and supervisory duties. See, MRPC 5.1 and 5.3. Lawyers are not absolved of liability for trust account misconduct by delegating accounting and recordkeeping responsibilities to an employee or agent.

(Emphasis added).[12]

### 2. Thompson did not Embezzle Plaintiffs' Settlement Proceeds

To prove Thompson embezzled their settlement proceeds, Plaintiffs must establish: (1) they entrusted their money to Thompson; (2) Thompson appropriated the money for a use other than that for which it was entrusted; and (3) the circumstances indicate fraud. *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1173 (6th Cir. 1996). Plaintiffs entrusted their settlement checks to Benner–Plaintiffs gave him, not Thompson, the limited power of attorney; therefore, the first element is not met.

Because Thompson did not have a fiduciary relationship with Plaintiffs, and did not embezzle their settlement proceeds, she is entitled to judgment as a matter of law on

---

[12]*Available at* http://www.michbar.org/opinions/ethics/numbered_opinions/R-007 (last visited March 15, 2016).

13

15-04775-mar    Doc 44    Filed 03/15/16    Entered 03/15/16 15:27:26    Page 13 of 16

Plaintiffs' 11 U.S.C. § 523(a)(4) claim.

### C. 11 U.S.C. § 523(a)(6)

11 U.S.C. § 523(a)(6) provides that debts for "willful and malicious injury by the debtor" are nondischargeable. Plaintiffs must establish that Thompson committed an injury that was both "willful" and "malicious." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) ("The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.") (Emphasis in original); *see also Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999) ("The judgment must be for an injury that is both willful and malicious. The absence of one creates a dischargeable debt.").

A "willful" injury is one that rises to the level of an intentional tort. *Geiger*, 523 U.S. at 61-62 ("the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself'") (quoting Restatement (Second) of Torts 8A, Comment *a*, p. 15 (1964) (emphasis added)). "Malicious" means "in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986).

Conversion can constitute an injury to property that falls within the scope of section 523(a)(6). *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934). However,

14

the conversion must be both willful and malicious: "a conversion which is innocent or technical" or "an honest but mistaken belief . . . that powers have been enlarged or incapacities removed" are not covered by section 523(a)(6). *Id.* In Michigan, civil conversion is defined as "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 391 (1992).

Knowing Plaintiffs had not received their settlement proceeds, Thompson used their money to pay the firm's expenses as well as her personal expenses. She also misled Szachta when he inquired about the whereabouts of the settlement check. This evidence creates a genuine issue of material fact as to whether Thompson deliberately or intentionally deprived Plaintiffs of their settlement proceeds.

## V. CONCLUSION

Because there is a genuine issue of material fact as to whether Thompson conspired with Benner to obtain Plaintiffs' settlement proceeds, the Court **DENIES** summary judgment under sections 523(a)(2)(A) and 523(a)(6); however, the Court **GRANTS** summary judgment under section 523(a)(4) as Thompson neither acted in a fiduciary capacity nor embezzled Plaintiffs' money.

**IT IS ORDERED**.

**Signed on March 15, 2016**

       /s/ Mark A. Randon       
**Mark A. Randon**             
**United States Bankruptcy Judge**

16